**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THEDE MOHR HIGHHOUSE,     )
           )
       Plaintiff,      )
           )      Civil Action No. 14-140 Erie
      v.           )
           )
UNITED STATES OF AMERICA,    )
           )
       Defendant.     )

## OPINION

**Mark R. Hornak, United States District Judge**

This civil action involves a claim by Plaintiff, Thede Mohr Highhouse, for money damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 - 2680.[1]   Presently pending before the Court is Plaintiff's Motion to Increase the *Ad Damnum* Damages Amount in his Complaint (ECF No. 51).  For the reasons set forth below, the motion will be granted.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Background Medical Facts

Plaintiff is a 61-year old male who resides in Erie County, Pennsylvania.  In January 2011, Plaintiff suffered a wrist injury while skiing, for which he sought treatment at the Veterans Administration Medical Center ("VAMC") in Erie, Pennsylvania.  He presented to the VAMC emergency room on January 22, 2011, at which time he underwent a closed reduction to restore a fracture in his left wrist.  Because Plaintiff had also hit his head at the time of his skiing accident, medical staff ordered a CT scan of his head.  The scan showed an apparent focal enlargement of the top of the basilar artery that was worrisome for a basilar tip aneurysm.  (Pl.'s Ex. L at 4, ECF No. 51-12; Pl.'s Ex. Q at 4, ECF No. 51-17.)

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

Plaintiff's primary health care provider at the VAMC, Lydia J. Maring, CRNP, ordered a follow-up MRI and MRA for further characterization. These studies, performed on February 4, 2011, showed a rather large basilar tip aneurysm and possible communicating artery aneurysm. (Pl.'s Ex. L at 4; Pl.'s Ex. Q at 4.) Plaintiff alleges that he was never informed of these abnormal findings, even during follow-up office visits on March 24 and October 20, 2011. (Compl. ¶¶ 16-19, ECF No. 1.)

On January 24, 2012, Plaintiff presented to the VAMC for epigastric pain, and the attending physician ordered a CT scan of the head based on his clinical history of headaches. The findings were again worrisome for an aneurysm at the tip of the basilar artery. A comparison of the CT imaging from January 22, 2011 and January 24, 2012 showed that, in fact, the basilar tip aneurysm had grown in size and shape over the prior year. (Pl.'s Ex. L at 7.) Plaintiff maintains that, once again, VAMC medical staff failed to inform him of the abnormal test results and took no action to prevent hemorrhaging or further aneurysm growth. (Compl. ¶¶ 25, 36.)

On January 30, 2012, Plaintiff presented to the VAMC emergency room after experiencing headaches, photosensitivity, nausea and vomiting. A CT of his head revealed an acute subarachnoid hemorrhage related to the basilar tip aneurysm. (Pl.'s Ex. L at 7-8; Pl.'s Ex. Q at 4.) Plaintiff was transported to Saint Vincent Health Center in Erie, where Charles Romero, M.D. performed a coil embolization of the ruptured aneurysm. (Pl.'s Ex. L at 9; Pl.'s Ex. Q at 4.) While hospitalized, Plaintiff experienced atrial flutter and fibrillation, cerebral salt wasting syndrome, and acute urinary retention. Following treatment, he was discharged on February 9, 2012. (Compl. ¶27; Pl.'s Ex. L at 10-13; Pl.'s Ex. Q at 4.)

Over the next two months, Plaintiff was seen at the VAMC by medical staff, along with social work, speech therapy, and behavioral health professionals, to address a variety of health-related issues. (Pl.'s Ex. Q at 4-5.) On February 28, 2012 Plaintiff was seen at the VAMC Urology Clinic for difficulty voiding and was instructed on an intermittent catheterization program. (Pl.'s Ex L at 16.) He was examined on March 2, 2012 at the Neurology Clinic regarding his headaches. (*Id.* at 17.) Five days later he saw an audiologist, who noted moderately severe sensorineural hearing loss bilaterally, consistent with a longstanding high frequency hearing loss. (*Id.*) Plaintiff was also examined by a speech pathologist for complaints of slurred speech, inability to form sentences, and memory impairment. (*Id.*) The pathologist administered the intermediate portion of the Ross Information Processing Assessment, which indicated that Plaintiff had a mild-to-moderate impairment. (*Id.* at 18.) On March 16, 2012, Plaintiff was seen in the Behavior Health Clinic and was diagnosed with Major Depressive Episode and Anxiety Disorder, to be managed medically and with individual and group therapy. (*Id.*) Plaintiff was then seen on March 22, 2012 by a psychiatrist, who assessed mood disorder, anxiety disorder, and cognitive disorder. (*Id.* at 19.) Plaintiff's mental status examination at that time revealed a mild cognitive impairment, including impaired short-term memory. His Global Assessment of Functioning ("GAF") was 65. (*Id.*)

On April 17, 2012, Plaintiff was admitted to Saint Vincent Health Center for treatment of his anterior communicating artery aneurysm. (Pl.'s Ex. L at 20.) Dr. Romero performed a stent-assisted coil embolization of the intracranial aneurysm and discharged Plaintiff two days later. (*Id.*)

In August 2012, Plaintiff again saw Dr. Romero and reported worsening headaches preceded by nausea and occasional vomiting. (*Id.* at 22.) Plaintiff was also experiencing left

lower quadrant visual obscuration and a kaleidoscope or prism pattern of visual disturbance with associated photophobia and phonophobia and occasional lightheadedness. Dr. Romero noted that Plaintiff's symptoms were consistent with migraines. He prescribed Fioricet and ordered a brain MR angiographic study, which was performed on September 9, 2012. (*Id.*) The MRA showed some irregularity of the basilar tip aneurysm, which could have been residual aneurysmal lumen. There was no abnormality noted with respect to the coiled anterior communicating artery aneurysm. (*Id.* at 22-23.)

On March 11, 2013, Plaintiff was seen by Michael Orinick, III, M.D., for a physical medicine rehabilitation consultation. (Def.'s Ex. G, ECF No. 55-7 at 6.) At that time, Plaintiff continued to report headaches and a "kaleidoscope" effect with his vision. Approximately one week prior to the office visit, he had experienced his first syncopal episode. (*Id.* at 7.) Plaintiff reported a number of "severe" symptoms to Dr. Ornick, including severe dizziness, loss of balance, vision and hearing problems, sensitivity to noise, anxiousness and distractibility. (*Id.* at 7-8.) Plaintiff also reported "very severe" forgetfulness, indecision, sleep problems, depression, irritability, and frustration. (*Id.*) Dr. Ornick diagnosed status post aneurysm bleed/subarachnoid hemorrhage, with coiling procedure and residual neurological problems. He referred Plaintiff for auditory and visual testing and speech therapy to evaluate for post-concussive residuals of memory problems and various other cognitive issues. (*Id.* at 10.)

Due to his worsening headaches, Plaintiff underwent additional testing on March 19, 2013. (Def.'s Ex. C, ECF No. 55-3 at 2.) MRI and MRA studies showed evidence of recanalization of the previously treated basilar tip aneurysm, but no recanalization of the anterior circulation aneurysm. (*Id.*) A cervical spine MRI showed degenerative cervical spondylosis

4

with moderate foraminal changes at C3-C4, C5-C6, and C6-C7. (Pl.'s Ex. L at 27-28.) The spinal cord appeared normal. (*Id.* at 28.)

On April 2, 2013, Plaintiff met with Dr. Romero to discuss his most recent brain studies. (Def.'s Ex. C, ECF No. 55-3 at 2.) At the time of his visit, Plaintiff reported that he was experiencing anxiety, depression and headaches 2 to 3 times per week. (*Id.* at 3.) Treatment notes reflect that Plaintiff's recanalized aneurysm measured approximately 13 x 12 x 11 millimeters. (*Id.* at 4.) Dr. Romero observed that, according to a published report, "large aneurysms between 11 and 25 mm have a 44% recurrence if incompletely coiled" and a 30 percent recurrence when completely coiled, and basilar tip aneurysms "notoriously have the highest likel[ihood] of recurrence as do aneurysms with increasing size." (*Id.*) Although Dr. Romero did not feel Plaintiff was at immediate risk of a rupture, he nevertheless felt that treatment was warranted, given the changes in Plaintiff's aneurysm that were compatible with recanalization. (*Id.*) During his consultation, Dr. Romero spent more than 15 minutes with Plaintiff discussing the findings, their implications, Plaintiff's options, and coordination of Plaintiff's care. (*Id.*)

On April 30, 2013, Plaintiff filed an application with the Social Security Administration for disability insurance benefits. In his application form, Plaintiff claimed that he had become disabled as of January 30, 2012 due to his brain aneurysm and a resulting loss of concentration and memory (both short term and long term), ambulatory problems, "balance [and] vision issues," migraine headaches, and depression. (Def.'s Ex. E, ECF No. 55-5 at 2.)

The following day, he filed his administrative claim under the FTCA, seeking damages for injuries sustained as a result of the ruptured basilar tip aneurysm. (Pl.'s Ex. A, ECF No. 51-1.) Plaintiff's claim included a request for $2 million in damages.

Thereafter, on May 9, 2013, Plaintiff underwent treatment to address the recanalized basilar tip aneurysm. The retreatment was more extensive than anticipated, requiring Dr. Romero to place 13 additional coils in Plaintiff's brain, in addition to a permanent endovascular stenting device. (Pl.'s Ex. C, ECF No. 51-3.) In the course of the treatment, one of the coils became displaced and was permanently lost in Plaintiff's brain. (*Id.*)

After initially being discharged for this procedure, Plaintiff was readmitted to the hospital for complaints of abdominal pain and an elevated bilirubin level. (Pl.'s Ex. D, ECF No. 51-4.) He was treated for a moderate-sized right retroperitoneal hemorrhage related to post-procedural bleeding and was discharged on May 18, 2013. (*Id.*; Pl.'s Ex. D, ECF No. 51-5.)

On June 4, 2013, Plaintiff was seen again by Dr. Orinick at the VAMC's traumatic brain injury clinic. (Def.'s Ex. G, ECF No. 55-7.) At that time, Plaintiff reported that his memory had deteriorated since his recent surgery, and he was having more difficulty focusing his vision in the mornings. (*Id.* at 2.) Many of his formerly severe symptoms were now moderate; however, he reported severe changes in his sense of taste and smell, severe increase of appetite, severe distractibility, very severe difficulty making decisions and a poor tolerance for frustration. (*Id.* at 3.)

In August 2013, Plaintiff underwent a disability examination by Glenn Bailey, Ph.D. (Pl.'s Ex. G, ECF No. 51-7.) Dr. Bailey diagnosed adjustment disorder, cognitive disorder, balance issues, difficulties with memory and concentration, vision and hearing problems, and cluster headaches. He assigned a GAF of 55. (*Id.*) Plaintiff was ultimately awarded permanent disability benefits, retroactive to the onset date of January 30, 2012, as the result of "intracranial injury" and related "affective/mood disorders." (Pl.'s Ex. F, ECF No. 51-6.)

In the meantime, Plaintiff had made an attempt after his May 9, 2013 coil embolization treatment to return to his volunteer duties as a "Structural Firefighter, Vehicle Rescue Technician." On September 6, 2013, while firefighting, Plaintiff passed out and was treated at the emergency room. (Pl.'s Ex. L, ECF No. 51-12; Pl.'s Ex. U, ECF No. 51-21.) Following this episode, Plaintiff's firefighting duties were restricted based on the fire chief's conclusion that Plaintiff would be unable to endure the physical stress that his former position had entailed. (Pl.'s Ex. H, ECF No. 51-8.)

On October 31, 2013, Plaintiff was again seen by Dr. Romero. (Def.'s Ex C, ECF No. 55-3 at 5-7.) At that time, Plaintiff was stable, with no new complaints. He was not experiencing headaches, unilateral numbness, weakness, coordination, or speech disturbance, but he continued to evidence baseline memory problems dating from the previous rupture of his basilar tip aneurysm. (*Id.* at 6.) Dr. Romero reviewed the results of Plaintiff's most recent MRA, which showed a small compartment suggestive of a second recanalization of the previously treated basilar tip aneurysm. (*Id.* at 5.) Dr. Romero spent more than 30 minutes counseling Plaintiff about the implications of the study as well as the risks and benefits of various treatment options. (*Id.* at 7.)

On Dr. Romero's recommendation, Plaintiff underwent a catheterization procedure on December 16, 2013 to obtain a more current angiographic view of his aneurysm and compare it to Plaintiff's postoperative images from May 2013. (*Id.*; Pl.'s Ex. I, ECF No. 51-9 at 5-6.) The imaging confirmed evidence of recanalization relative to the basilar tip aneurysm, but there was no evidence of growth or recanalization of the aneurysm at the anterior communicating artery complex. (Pl.'s Ex. I, ECF No. 51-9 at 5-6.)

Consequently, Plaintiff underwent a third procedure on January 21, 2014 to address the recanalization of his basilar artery tip aneurysm. (Pl.'s Ex. J, ECF No. 51-10.) This time, the procedure was performed without incident, and Plaintiff was discharged two days later. (*Id.*)

Plaintiff continued to follow-up with Dr. Romero periodically throughout the rest of 2014. On April 2, 2014, Dr. Romero ordered an occipital nerve block at the VAMC for treatment of Plaintiff's headaches. (Pl.'s Ex. L at 39.) In a September 4, 2014 visit, Dr. Romero diagnosed attention and concentration deficits and noted Plaintiff's complaints of worsening concentration. (*Id.*) Dr. Romero also documented Plaintiff's continued reports of headaches, dizziness, lightheadedness, disturbances in coordination, confusion, loss of balance, disorientation, and memory loss. (*Id.*) In October 2014, additional brain studies were performed. An October 21, 2014 MRI showed no acute infarct or hemorrhage, but some cerebral atrophy was present. (*Id.*) An October 29 MRA showed no evidence of aneurysm recanalization. (*Id.* at 40.)

On January 26, 2015, Plaintiff underwent an interval surveillance catheter cerebral angiographic study, which again showed no evidence of regrowth or recanalization of the basilar tip aneurysm. (Pl.'s Ex. K, ECF No. 51-11.) Plaintiff's plan at that point was to continue visits with his primary care physician at the VA Hospital every three to four months. In addition, Dr. Romero agreed to see Plaintiff every 3 to 6 months and as needed, with yearly angiographic assessments being performed to monitor Plaintiff's cerebral circulation. (Pl.'s Ex. K; Pl.'s Ex. L at 58.)[2]

---

[2] Plaintiff represents that he received another favorable assessment in February 2016. (*See* Pl.'s Mot. to Increase the *Ad Damnum* Damages Amount at ¶67, ECF No. 51.)

## B. Procedural Background and Additional Medical Evidence

### 1. Plaintiff's Administrative Claim

As noted, Plaintiff filed an administrative claim on May 1, 2013, asserting numerous injuries as a result of his ruptured basilar tip aneurysm. (Pl.'s Ex. A, ECF No. 51-1.) In "Block 10" of his claim form, Plaintiff alleged that:

> Injuries include, but are not limited to, growth in size of basilar tip aneurysm, ruptured basilar tip aneurysm, extensive subarachnoid hemorrhage as a result of the ruptured basilar tip aneurysm, nausea, vomiting, GI upset, weakness, fever, cerebral salt-wasting syndrome, hyponatremia requiring salt supplementation, atrial fibrillation, atrial flutter, heart injury and problems, massive thunderclap quality headaches, numbness in both legs, burning eyes, dizziness, vertigo, short term memory loss, hearing loss, ringing and noise in ears, vision loss, double vision, lower quadrant visual obscuration, blurriness with kaleidoscope or prism patterns of disturbance, ocular migraines with temporal swelling, loss of coordination, weakness in hands, knees and legs, loss of bladder control, acute urinary retention, back pain, back spasms, neck pain, anxiety, depression, trouble walking, necessity to use a cane as an assistive device, inability to work due to memory loss and dizziness after the rupture of his aneurysm, untreated aneurysm at the anterior communicating artery complex level, which required separate treatment with separate surgery and convalescence in the face of a previous coil embolization, residual aneurysm lumen, recurrence and recanalization of basilar tip aneurysm, increased risk for recanalization of the basilar tip aneurysm due to its rupture, increased risk for recanalization of the anterior communicating artery, arm numbness and discomfort, severe insomnia, severe emotional distress, and all symptoms and sequelae associated with all of the above diagnoses, severe pain and suffering, avoidable medical treatment and enormous medical expenses, including several hospitalizations, procedures and future treatment continuing into the indefinite future from permanent damages caused by the negligence of the VA Medical Ctr – Erie employees/agents. The damages are not exhaustive.

(Pl.'s Ex. A, ECF No. 51-1.) Elsewhere, Plaintiff alleged that:

> On March 19, 2013, on an MRI/MRA of the brain, there was evidence of recurrence and recanalization of the previously treated basilar tip aneurysm. Claimant needs surgical retreatment of his recanalized ruptured basilar tip aneurysm. He is at increased risk for future harm and damages. . . . . [T]he claimant suffered injuries to his brain, a major brain bleed, injury to his heart and kidneys, and several life threatening conditions and symptoms, several surgeries and unnecessary hospital admissions and several unnecessary procedures and pain and suffering that otherwise would have been avoided.

> Claimant was totally disabled and has been unable to work since his aneurysm
> ruptured. He was and is still at least partially disabled and will remain so for
> the remainder of his life. He uses a cane and has lost short term memory and
> his ability to concentrate.

(*Id.* at Block 8.)

Based on these alleged injuries, Plaintiff asserted a sum certain claim of $2 million. (*Id.* at Block 12b.) His claim was administratively denied on November 22, 2013. (Pl.'s Ex. B, ECF No. 51-2.)

### 2. The Present Lawsuit

#### a. The Complaint

On May 12, 2014, Plaintiff commenced this civil action for damages under the FTCA. in general, Plaintiff alleges that various health care providers at the VAMC were negligent in failing to properly address his basilar tip aneurysm, which proximately led to his subarachnoid hemorrhage on January 30, 2012 and resulting injuries. As originally pled, Plaintiff's Complaint sought damages in the amount of $2 million. (Compl. at 15, ECF No. 1.)

In the course of pretrial proceedings, both parties retained expert witnesses who rendered opinions bearing on issues of liability and damages. For present purposes, the following expert opinions are relevant.

#### b. Charles Romero, M.D.

Dr. Romero was deposed on May 22, 2015 concerning his knowledge of Plaintiff's medical history and present condition. (*See* Pl.'s Ex. M, Deposition of Charles E. Romero, M.D., ECF No. 51-13.) In relevant part, Dr. Romero testified that: (i) Plaintiff suffered a permanent thalamic brain injury as a result of his ruptured aneurysm (Romero Dep. at 112:21-114:1); (ii) this rupture proximately caused the recanalizations and recurrences of the basilar tip aneurysm that necessitated the subsequent coil embolization procedures (*id.* at 102:14-103:20);

and (iii) Plaintiff's memory loss, visual obscurations, dizziness, vertigo, anxiety, depression, and headaches were proximately related to the rupture of the basilar tip aneurysm (*id.* at 114:23-118:23).

Dr. Romero subsequently issued a supplemental letter report in which he expounded on parts of his deposition testimony and rendered certain additional expert opinions. (Pl.'s Ex. U, ECF No. 51-21.) Relevantly, Dr. Romero opined that Plaintiff has sustained a permanent brain injury, memory loss, and cognitive disorder as a direct result of his subarachnoid hemorrhage. (*Id.*) He predicted that Plaintiff will likely develop early onset dementia due to the rupture of his basilar tip aneurysm and will need to be placed on Cholinesterase inhibitor at the appropriate time, which might positively impact his neuropsychological recovery. (*Id.*) Dr. Romero estimated that, because of his ruptured aneurysm, Plaintiff would likely experience a recanalization requiring additional treatment about once every five years over the remainder of his life. (*Id.*) "When this happens," Dr. Romero opined, "[Plaintiff] will be expected to experience worsening of his brain injury symptoms such as worsening headaches, pain, confusion, memory loss and cognitive issues." (*Id.*)

### c. Richard Paul Bonfiglio, M.D.

On February 18, 2015, Plaintiff was evaluated by Richard Paul Bonfiglio, M.D., a physical medicine and rehabilitation specialist, for the purposes of ascertaining his future care needs. (Pl.'s Ex. L, ECF No. 51-12.) Dr. Bonfiglio opined that Plaintiff's ruptured basilar tip aneurysm and resulting subarachnoid hemorrhage had caused traumatic and permanent thalamic brain injury. (Pl.'s Ex. L at p. 53.) Further,

> [t]he brain injury has caused Mr. Highhouse to have altered memory and sensation, decreased attention, concentration, and ability to perform mental math. The brain injury also caused word finding difficulties, intermittent dizziness, lightheadedness, vertigo, impaired balance, altered coordination, bilateral

11

intermittent needle-like hand pain and paresthesias, diffuse weakness, chronic fatigue, urinary symptoms, reduced hearing, impaired sense of taste, an anxiety disorder, cognitive disorder, depression, and headaches. The headaches often have associated syncope, gastrointestinal upset, nausea, vomiting, and visual disturbances. His sleep is also affected and he seems to have hypersomnia, nightmares, and emotional distress. Due to his ongoing symptoms, Mr. Highhouse becomes fatigued with performing basic activities of daily living. He has not been able to return to work in any capacity.

(*Id.*)

Based on the complexity of Plaintiff's injuries and his numerous ongoing medical issues,

Dr. Bonfiglio made a number of detailed recommendations concerning Plaintiff's future care, *to*

*wit:*

Mr. Highhouse should be followed two to four times per year and as needed by a primary care physician for evaluation and management of the sequelae of his brain injury. This physician should obtain needed diagnostic testing as the patient's medical condition warrants. He would benefit presently from neuropsychological testing and an evaluation by a speech pathologist to delineate the full extent and nature of his ongoing cognitive and linguistic deficits and to help direct an ongoing rehabilitation effort. Laboratory testing including a complete blood cell count (CBC) and complete metabolic profile should be done twice per year and as needed. A sleep study should be done to determine the nature and extent of his sleep disorder. This physician should also make referrals to other health care providers as the patient's condition warrants.

Due to his urological symptoms and likely neurogenic bladder, Mr. Highhouse should be followed once to twice per year by a urologist. He will need associated diagnostic testing including twice yearly BUN, creatinine, creatinine clearance, urinalysis, and urine culture. Renal and bladder ultrasound should be done annually and cystoscopy every two to three years. Mr. Highhouse should be followed annually by a neuro-ophthalmologist to monitor and manage his visual symptoms and impairments. He should be seen annually be a neuro-otolaryngologist regarding his hearing loss, dizziness, lightheadedness, and vertigo. A neurologist should monitor annually and as needed Mr. Highhouse's neurological functioning and check for potential complications including aneurysmal re-canalization, subarachnoid hemorrhage, and hydrocephalus. Associated diagnostic testing should include an annual and as needed brain CT scan, MRI, and/or MRA.

Mr. Highhouse should be followed every three months by a psychiatrist for prescription of psychotropic medications to treat his mood and anxiety disorder. He should also be seen weekly by a psychologist for six months to help him deal with his impairments and chronic pain. A physician pain management specialist

should direct a more comprehensive approach to his multiple chronic pain problems. Treatment should include oral medications, injections, physical modalities, and relaxation training. He should be followed by this pain management specialist every three months and as needed for prescription of his pain medications.

Mr. Highhouse should also be followed twice per year by a physician specializing in Physical Medicine and Rehabilitation to direct and prescribe an ongoing rehabilitation effort. Over his lifetime, he will need at least four to six additional courses each of physical, occupational, and [speech] therapies to deal with his pain, cognitive, and linguistic issues. Each of these courses of therapy is expected to average two to three sessions per week for two to three months. He will continue to need adaptive equipment including ambulatory aides like a cane and shoes with cleats. He should also use a daily planner and a shower chair. He will continue to need medications to deal with his chronic pain issues and psychological problems.

Due to his chronic fatigue, pain issues, cognitive and linguistic impairments, Mr. Highhouse should presently have the assistance of a certified nursing assistant or attendant two to four hours per day. He also need assistance with basic home maintenance including lawn care and snow removal. As he ages due to the impact of the aging process on his symptoms and impairments, Mr. Highhouse will likely need additional assistance with daily activities. By age 70, it is anticipated that he will need the help of an attendant or certified nursing assistant four to eight hours per day.

(Pl.'s Ex. L at 54-58.) Despite Plaintiff's functional limitations and symptomology associated with his brain injury, Dr. Bonfiglio expected that Plaintiff would have a normal life expectancy, provided he received the care prescribed. (*Id.* at 58.)

#### d. Michael Schwabenbauer, Ph.D., ABPP

On June 16, 2015, Dr. Romero referred Plaintiff for a neuropsychological evaluation, in accordance with Dr. Bonfiglio's recommendation. (Pl.'s Ex. N, ECF No. 51-14.) The requested examination was performed on October 5, 2015 by Michael Schwabenbauer, Ph.D., ABPP. (Pl.'s Ex. P, ECF No. 51-16.)

Dr. Schwabenbauer found that Plaintiff had significant cognitive impairment, including measures of delayed verbal recall. (*Id.* at 6.) In particular, Plaintiff's scores reflected significant compromise with respect to a number of encoding and retrieval measures and a notable slowing

13

in Plaintiff's processing speed. (*Id.*) Dr. Schwabenbauer felt that Plaintiff endorsed "critical items that reflect significant emotional overlay, including depression and anxiety." (*Id.*) Plaintiff also reported periods of persistent cognitive impairment, particularly in terms of memory functioning, since the completion of surgery. (*Id.*) The findings reflected a significant compromise on measures of more complex attention, including sustained attention, persistent inattentiveness and impaired vigilance. (*Id.*) Dr. Schwabenbauer felt these significant attentional deficits were likely to exacerbate Plaintiff's underlying memory deficits and have a considerable impact on Plaintiff's day-to-day cognitive functioning, especially with respect to more complex situations. (*Id.* at 5 and 6.) Dr. Schwabenbauer diagnosed "Cognitive Disorder NOS secondary to the prior aneurysm bleed and subarachnoid hemorrhage" and recommended initiation of a cholinesterase inhibitor. (*Id.* at 6.) He expressed concern about early onset dementia symptoms and recommended a follow-up neuropsychological examination to be completed in 12 to 24 months. (*Id.* at 6-7.) Dr. Schwabenbauer opined that Plaintiff's subarachnoid hemorrhage was a likely a significant contributing factor to the test findings and Plaintiff's level of cognitive, behavioral and emotional functioning. (*Id.* at 7.)

### e. Heidi L. Fawber, M.Ed., LPC, CRC

On March 25, 2016, Heidi L. Fawber, M.Ed., LPC, CRC, completed a life care plan for Plaintiff, which detailed the various medical interventions and treatments, therapies, and other assistance Plaintiff would need during his lifetime. (PL.'s Ex. Q, ECF No. 51-17.) Ms. Fawber based her plan on the reports and recommendations of Dr. Bonfiglio, Dr. Romero, Dr. Schwabenbauer, and the Government's medical examiner, an independent review of Plaintiff's extensive medical records, and Ms. Fawber's own meeting with Plaintiff. The life care plan included an estimate of the base and life-time costs associated with Plaintiff's future health care

14

evaluations, any required counseling and therapies, diagnostic tests, medications, routine medical care, medical equipment, home nursing or health aid assistance, and property maintenance assistance. (Pl.'s Ex. Q at 12-18, ECF No. 51-17.) In total, Ms. Fawber opined that the lifetime costs of Plaintiff's life care plan would range between $1,094,980 and $1,991,869, depending on frequencies of physical therapies, diagnostic studies, and home care. (*Id.* at 10.)[3] Ms. Fawber's figures did not include the cost of future recanalization treatments because she felt it could not be known whether or not Plaintiff would experience recanalization or require additional treatments in the future. (*Id.* at 9.) Given Plaintiff's past medical history, however, Ms. Fawber recommended that such costs be taken into account and, to that end, she noted that Plaintiff's latest charges for retreatment approached $71,000. (*Id.* at 10.)

Based on Dr. Romero's expectation that Plaintiff would experience a recanalization every five years for which he would require treatment -- and assuming a normal 21-year life expectancy, Plaintiff contends that he will likely have to undergo four recanalization treatments over the course of his natural life. Assuming a cost of approximately $71,000 for each surgery, Plaintiff estimates that his future treatment costs – not accounting for inflation or present value reduction – will total at least $284,000.

### f. Matthew R. Marlin, Ph.D.

On April 19, 2016, Matthew R. Marlin, Ph.D. issued a report outlining the present value of Plaintiff's life care plan, as outlined by Ms. Fawber. (Pl's Ex. R, ECF No. 51-18.) Dr. Marlin adjusted Ms. Fawber's estimates for inflation and then reduced them to present-day value. After doing so, Dr. Marlin projected that the costs of Plaintiff's life care plan, excluding any future treatments for recanalizations, would range from $1,225,720 to $2,286,409. (*Id.*)

---

[3] Ms. Fawber's life care plan was subsequently reviewed and approved by Dr. Bonfiglio on April 14, 2016. (Pl.'s Ex. S, ECF No. 51-19.)

Dr. Marlin projected Plaintiff's damages from lost income in a subsequent report issued on April 24, 2016. (Pl.'s Ex. T, ECF No. 51-20.) Dr. Marlin estimated that Plaintiff's economic losses, reduced to present-day value, would range from $118,887 to $137,135. (*Id.*)

### g. The Pending Motion

On June 30, 2016, Plaintiff filed the pending motion to increase the amount sought in his *ad damnum* clause to $3.95 million. (ECF No. 51.) Plaintiff contends that the amendment is warranted because he has sustained additional damages since the filing of his administrative claim that were not reasonably discoverable or foreseeable as of the May 1, 2013 administrative filing date. Based on the expert reports discussed above, it appears that Plaintiffs' alleged amended damages claim can be broken down as follows:

| | | | |
|---|---|---|---|
| Life Care Plan Costs: | $1,225,720 | to | $2,286,409 |
| Lost income: | $118,887 | to | $137,135 |
| Future treatments | | | $284,000 |
| Special damages | | | $100,000 |
| Non-economic damages | | | $1,142,456 |
| Total Damages | | | $3,950,000 |

## II.   DISCUSSION

### A.   Amended Pleading Standard

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend pleadings shall be freely given "when justice so requires." A court should allow a party to amend its pleading, provided there is no undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice or futility of the amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.2000); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir.2004) ("'[A]bsent undue or substantial prejudice ... denial

[can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.'") (quoting *Lundy v. Adamar of N.J., Inc.*, 34 F.3d 1173, 1196 (3d Cir.1994) (internal quotation marks omitted)).

In this case, there is a question as to whether amendment of the *ad damnum* clause would be futile. An amended complaint is futile if it fails to state a claim upon which relief could be granted. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 231 (3d Cir. 2011) (citation omitted). In determining whether an amendment is futile, courts apply "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id.* (citation omitted). To that end, the Court must consider the relevant provisions of the Federal Tort Claims Act.

### B.     The Federal Tort Claims Act

Under the FTCA, any party asserting a claim for money damages arising out of the negligent or wrongful act of a government employee must first file a claim with the administrative agency at issue. 28 U.S.C. § 2675(a). The agency then has six months within which to consider the claim and respond. 28 C.F.R. § 14.2. The injured party may file suit after the claim is denied or after the time for agency consideration has expired, if the agency has failed to act. 28 U.S.C. § 2675(a). A party may amend his claim up until the time the agency issues a final denial or upon the exercise of the claimant's option to sue after the expiration of the agency's six months period for consideration. 28 C.F.R. § 14.2. If the party opts to file a lawsuit, the party is limited to the amount of the administrative claim, except "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening fact, relating to the amount of the claim." 28 U.S.C. §2675(b).

Plaintiff contends that "newly discovered evidence" and "intervening facts" relating to his medical condition warrant an amendment to his prior monetary claim. 28 U.S.C. §2675(b). The Government disputes the applicability of the statutory exception. The Court must therefore determine whether Plaintiff has demonstrated the existence of "newly discovered evidence" or "intervening facts" that would justify the requested amendment.[4]

Complicating our inquiry is the fact that there is no uniform standard in this circuit for implementing the exception set forth in §2675(b). Outside of the Third Circuit, federal courts have articulated various different tests for determining whether an FTCA claimant has presented "newly discovered evidence" or demonstrated the existence of "intervening facts" within the meaning of §2675(b).

The U.S. District Court for the District of New Jersey recently discussed these various tests in *Bravo-Garcia v. United States*, Civil No. 13-2185 (NLH/JS), 2015 WL 224625, at *4 (D.N.J. Jan. 15, 2015). In that case, an FTCA plaintiff initially filed a \$250,000 administrative claim for injuries sustained as the result of being negligently struck by a U.S. Mail truck. The initial claim amount was based on the plaintiff's belief that his injuries were limited to herniations in his cervical spine and a torn rotator cuff. After amending his claim once to assert a monetary demand of \$1 million, the plaintiff later sought to increase his judgment demand to "not more than" \$5 million. The plaintiff claimed that two worsening injuries – *i.e.,* newly discovered psychiatric/cognitive problems and left shoulder and upper extremity conditions –

---

[4] Plaintiff has the burden of demonstrating that that the exception applies. *See Njos v. Kane*, Civil No. 3:CV-12-1252, 2015 WL 999398, at *3 (M.D. Pa. Mar. 5, 2015) (noting that "courts have uniformly placed the burden of proving ['newly discovered evidence' or 'intervening facts'] on the FTCA claimant")(citing authority); *Bravo-Garcia v. United States*, Civil No. 13-2185 (NLH/JS), 2015 WL 224625, at *4 (D.N.J. Jan. 15, 2015) ("The burden is on the plaintiff to prove that he or she is entitled to seek damages in excess of the amount sought in the administrative tort claim . . . .") (citing *Schwartz v. United States*, 446 F.2d 1380, 1381 (3d Cir. 1971)).

had required unforeseen ongoing treatment and rendered him permanently disabled. 2015 WL 224625, at *6.

In assessing the plaintiff's motion to amend his damages claim, the court in *Bravo-Garcia* first considered the various standards that other jurisdictions have developed in applying §2675(b). The court broadly described these alternatives as the "worst-case prognosis" test, the "reasonably discoverable/foreseeable" test, and the "change in expectations" test, and described them thusly:

> The worst-case prognosis test first appeared in *Low v. United States*, 795 F.2d 466 (5th Cir.1986). In *Low*, the plaintiff alleged that the defendant committed medical malpractice during her son's birth at a Navy medical facility which caused her son severe permanent injuries. *Id.* When the plaintiff's son was two years-old, the plaintiff filed an administrative tort claim seeking $1,275,000 in damages. *Id.* at 468. The plaintiff later increased her claim to $12 million and argued that at the time she filed the original administrative tort claim it was too early to know "a final prediction" of the extent of her son's injuries. *Id.* at 470. While the district court permitted a jury verdict in excess of the original $1,275,000 claim, the Fifth Circuit reversed, finding that at the time the administrative tort claim was filed the plaintiff knew the "worst-case prognosis" for her son "was one of great severity." *Id.* at 471. In other words, according to the Fifth Circuit, a plaintiff must predict not only what is within the reasonable universe of injuries or damages, but must assume the worst-case could occur in making a FTCA demand. *See also Lebron v. United States*, 279 F.3d 321, 330 (5th Cir.2002) (applying the worst-case prognosis test to a FTCA claim). On similar facts to *Low*, the worst-case prognosis test was subsequently adopted by the First Circuit in *Reilly v. United States*, 863 F.2d 149 (1st Cir.1988) ("[t]he mere fact that these dread consequences, feared from the beginning, had become more certain does not suffice to brand them 'newly discovered.'").

> In contrast, the Second, Fourth, Sixth and Eighth Circuits have adopted a reasonably discoverable or reasonably foreseeable test to determine if "newly discovered evidence" or "intervening facts" are present. *See, e.g., O'Rourke v. E. Air Lines, Inc.*, 730 F.2d 842 (2d Cir.1984); *Spivey v. United States*, 912 F.2d 80 (4th Cir.1990); *Allgeier v. United States*, 909 F.2d 869 (6th Cir.1990); *Michels v. United States*, 31 F.3d 686 (8th Cir.1994). The leading case applying the "reasonably discoverable" test is *Michels v. United States*. In *Michels*, the plaintiff was injured when his motorcycle collided with a government vehicle. 31 F.3d 686, 687 (8th Cir.1994). The plaintiff originally filed an administrative claim of $450,000, but following a bench trial, was awarded $710,000 in damages because the district court found that the plaintiff had no signs of a later-developing knee condition at the time the claim was filed and did not know that

he would be permanently unable to manage his family farm. *Id.* at 687. The Eighth Circuit affirmed the district court, finding that a "known injury can worsen in ways not reasonably discoverable by the claimant and his or her treating physician, [and] such 'newly discovered evidence' or 'intervening facts,' if convincingly proved, can warrant §2675(b) relief." *Id.* at 688.

The third approach adopted by the Eleventh Circuit is the "change in expectations" test. *Fraysier v. United States*, 766 F.2d 478 (11th Cir.1985). In *Fraysier*, the plaintiff sued the United States following an extreme reaction to the swine flu vaccine. Later, the plaintiff increased his claim when he was diagnosed with Guillain–Barre Syndrome which caused permanent injury. *Id.* at 479. The court stated that the "legal question becomes whether this change in expectation, reasonably based, is newly discovered evidence within the meaning of the statute." *Id.* at 480. In applying Section 2675(b), the Eleventh Circuit found that at the time the original administrative claim was filed, plaintiff had "no reason to believe that his condition would be permanent" and permitted damages above the amount claimed. *Id.*

2015 WL 224625, at \*5–6.

Ultimately, the *Bravo-Garcia* adopted the "reasonably foreseeable" approach. The court considered the "worst-case prognosis" standard to be unsatisfactory in that it discouraged claimants from submitting a reasonable settlement demand to the responsible federal agency. The court was concerned that injured claimants would be "forced to inflate all damage projections for fear of the inability to later amend the demand" -- a scenario that the court believed was unconducive to both "efficient administrative processing" and settlement. 2015 WL 224625, at \*6. The court also considered this standard too difficult to apply because "it requires a probing analysis into whether a reasonable doctor or patient did, or should have, projected the worst possible result for the plaintiff, even if that outcome is unforeseeable or even outlandish." *Id.* As for the "change in expectations" test, the *Bravo-Garcia* court declined to adopt this standard because it found the test "too subjective and difficult to apply." *Id.* By contrast, the *Bravo-Garcia* court found that the "reasonably foreseeable" approach best accommodated the relevant competing interests: *i.e.*, while still "fact intensive," this test "focuse[d] on whether it was foreseeable that the plaintiff's injuries would worsen beyond the

original claim." *Id.* The court found this approach to be "consistent with the language in Section 2675(b) which permits an amendment where the new evidence was not '*reasonably* discoverable.'" *Id.* (quoting §2675(b)(emphasis in the original)).

Applying this standard, the *Bravo-Garcia* court granted the plaintiff's request to amend his claim. The court noted that the plaintiff's post-accident medical history was extensive and complicated, evidencing progress at times and set backs at other times. 2015 WL 224625, at *7. Thus, it was "understandable" that "the eventual seriousness of plaintiff's injuries did not become reasonably discoverable" until after the date of the operable administrative claim. *Id.* Although there were "fleeting" references to cognitive problems in the medical records as of the time that plaintiff had filed his amended FTCA claim, the court observed that plaintiff's treating psychiatrist had only recently opined that plaintiff's neurocognitive impairment was the result of a closed head injury directly attributable to the accident. Moreover, the psychiatrist had only recently recommended that plaintiff undergo a course of psychiatric treatment. *Id.,* at *8. With regard to the plaintiff's shoulder and upper extremity issues, the record showed that the plaintiff had been symptomatic at the time his amended claim notice was filed, having repeatedly complained of neck and shoulder pain; however, it was only later that the plaintiff was diagnosed with cervical radiculitis, radiculopathy, and brachial plexopathy. *Id.,* at *9. Although there were conflicting opinions at the time of the plaintiff's administrative claim as to whether the plaintiff suffered from brachial plexopathy, the court determined that it "[would] not punish plaintiff because two doctors believed plaintiff had brachial plexopathy and one did not." *Id.,* at *10. The court reasoned that it was "not the burden of the tort victim . . . to predict with certainty his or her final prognosis merely because he or she can point to persistent symptoms. Such a policy would impose an undue burden on tort victims that is not supported in the case law." *Id.* Based

21

on these considerations, the court allowed the plaintiff to increase the amount of his damages claim. *Id.*

A somewhat different approach was taken in *Chamberlain v. United States,* Civil Action No. 11-1808 (JAP), 2012 WL 136896 (D.N.J. Jan. 18, 2012). Like *Bravo-Garcia, Chamberlain* involved a plaintiff who had been injured by a U.S. Postal Service truck. After originally filing an administrative claim for $150,000, the plaintiff submitted an amended claim for $350,000, and settlement negotiations ensued thereafter. In negotiating her claim, the plaintiff relied on her insurer's expense log, which purported to list the plaintiff's past medical expenses, including expenses relating to a prior surgery. Ultimately, settlement negotiations fell through, and the plaintiff filed suit. Sometime thereafter, the plaintiff received an updated expense log which included approximately $100,000 in new medical charges, including certain newly added back-charges relating to the prior surgery. Based on this change in information, the plaintiff filed a motion to increase her damages claim from $350,000 to $460,332.66.

Utilizing the "worst case scenario" test articulated in *Low v. United States,* 795 F.2d 466 (5th Cir. 1986), the court in *Chamberlain* denied the plaintiff's motion to increase her damages claim. The court started from the premise that the purposes of §2675's "sum certain" limitation "'is to ensure that federal agencies charged with making an initial attempt to settle tort claims against the United States are given full notice of the government's potential liability.'" 2012 WL 136896, at *3 (quoting *Low,* 795 F.2d at 471). The court explained that,

> "[r]equiring the plaintiff to guard against a worst-case scenario in preparing [her] claim gives the Government full notice of its maximum potential liability in the case. This encourages settlement of FTCA cases in accordance with the statute's purposes." Accordingly, in making a claim under §2675, a claimant must set forth a "worst-case scenario" even if it means estimating future expenses flowing from a known injury.

*Id.* (quoting *Lebron v. United States,* 279 F.3d 321, 330-31 (5th Cir. 2002) (first alteration in the original)). The court went on to explain that "'[n]ewly discovered evidence' and 'intervening facts' have been interpreted as relating to the knowledge of the extent of the injury, and more particularly, whether the claimant knew or reasonably could have known the full potential of his or her injury." *Id.* (citing *Dickerson v. United States,* 280 F.3d 470, 476-76 (5th Cir. 2002)). This requires the claimant to "present more than just new information that 'merely concerns the precision with which the nature, extent, or duration of a claimant's condition can be known.'" *Id.* (citing *Lebron,* 279 F.3d at 330). Rather, the court explained, information is considered newly discovered or intervening, if it sheds "'new light on the basic severity of the claimant's condition – that is, if it materially differs from the worst-case prognosis of which the claimant knew or could reasonably have known when the claim was filed.'" *Id.* (quoting *Lebron,* 279 F.3d at 330, and citing additional authority).

Applying this standard, the *Chamberlain* court disallowed the requested amendment. Critically, the court observed that the plaintiff "did not claim that her condition deteriorated after she amended her claim on September 1, 2010," nor did she claim "that there is any new evidence relating to her condition, or that she was unable to evaluate the extent of her injuries." 2012 WL 136896, at *4. Although the plaintiff may have relied in good faith on her insurer's expense log in underestimating the expenses associated with her surgery, the court concluded that this would not justify allowing her to increase the amount of her damages claim because "actual expenses are not the touchstone of the §2675(b) exception." *Id.*, at *5. Instead, the court wrote, "it [was] Plaintiff's burden to make her worst-case estimate of those expenses." *Id.* Because she failed to do so, the court denied her motion to amend. *Id.*

For purposes of resolving the pending motion, Plaintiff urges the Court to apply the "reasonably foreseeable" test utilized in *Bravo-Garcia,* while the Government urges the Court to apply the "worse-case scenario" test used in *Chamberlain.* Having reviewed both decisions, this Court is of the view that the "reasonably foreseeable" standard is more in keeping with the policy goals underlying §2675(b). In this Court's estimation, strict adherence to a "worst case scenario" standard is undesirable because it incentivizes claimants to overinflate their damages. This, in turn, works to frustrate – not foster -- the ultimate policy goals of the FTCA, which include encouraging settlements. Accordingly, in determining whether Plaintiff's motion to amend the *ad damnum* clause should be granted, this Court will follow the "reasonably foreseeable/ reasonably discoverable" – standard outlined in *Bravo-Garcia*.

### C.   Analysis

Having thus determined the governing legal standard, the Court concludes that Plaintiff's motion to amend should be granted. Here, as in *Bravo-Garcia,* the Plaintiff's medical history is extensive and complex. As the Court's discussion of the background facts demonstrates, Plaintiff has endured a multiplicity of serious, chronic injuries and related symptoms as a result of his ruptured aneurysm, for which he has received continual treatment since January 2012. As Ms. Fawber set forth in her March 25, 2016 report, Plaintiff's various physical, cognitive, and emotional/behavioral symptoms have affected him on a daily basis, "limiting his ability to work and socialize, reducing his level of independence, and significantly affecting his quality of life." (Pl.'s Ex. Q at 2.) In general, the record supports the conclusion that Plaintiff did not know, and could not have reasonably foreseen, the full extent and severity of his injuries as of the time that his administrative claim was pending.

First, the Court is persuaded that Plaintiff could not have known the full extent to which his ruptured aneurysm would necessitate future treatments. As of May 1, 2013, when Plaintiff filed his administrative claim, he was preparing to undergo a second coil embolization for the recanalization of his aneurysm. That retreatment occurred on May 9, 2013. Plaintiff's third treatment did not occur until January 21, 2014. Moreover, it was not until October 2014 and January 2015 that Plaintiff's angiographic studies were negative for regrowth and recanalization, suggesting that his aneurysm had finally stabilized. Thereafter, Dr. Romero opined that Plaintiff could expect to experience a recanalization, necessitating further treatment, approximately once every five years for the rest of his life. (See Pl.'s Ex. U, ECF no. 51-21.) There is no indication that this particular information was made known to Plaintiff, or was reasonably foreseeable to him, prior to the time that Plaintiff filed his administrative claim. Moreover, the total number of retreatments that Plaintiff will likely require over the course of his life depends, in part, on his expected life span. As far as the Court can tell, there is no indication in the record of any health care provider opinion on Plaintiff's life expectancy prior to February 2015, when Dr. Bonfiglio opined that Plaintiff's brain injury would not reduce his life expectancy. Thus, to the extent Plaintiff's damages claim is comprised of costs associated with retreatment of his basilar tip aneurysm, Plaintiff has demonstrated the existence of newly discovered evidence and intervening facts bearing on this issue that were not reasonably discoverable to Plaintiff when he filed his administrative claim.[5]

---

[5] The Government makes much of the fact that, as of May 1, 2013, Plaintiff knew there was evidence of recanalization of the basilar tip aneurysm and that a second coil embolization procedure would be scheduled. Indeed, Plaintiff's administrative claim form specifically alleged that he had shown "evidence of recurrence and recanalization" and that he was at an "increased risk for recanalization of the basilar tip aneurysm due to its rupture." (Pl.'s Ex. A, ECF No. 51-1 at Blocks 8 and 10.) Furthermore, Plaintiff may have known about the general risk of recanalization that was associated with aneurysms of his type and size. Dr. Romero's April 2, 2013 office notes specifically reference a published report documenting that, in larger aneurysms, there was a 44% of recurrence if the aneurysms were incompletely coiled, and a 30% recurrence rate even in those that were completely coiled. (Def.'s Ex. C at p.7, ECF No. 55-3.) These office notes further reflect that Dr. Romero spent time with Plaintiff

Second, the medical evidence suggests that some of Plaintiff's previously known symptoms – such as memory loss and vision problems -- became more severe in the time period after Plaintiff's administrative claim was filed. Although Plaintiff reported memory deficits and vision problems prior to filing his administrative claim, Dr. Orinick's treatment notes from June 2013 reflect Plaintiff's complaints that his memory problems had worsened since the second coil embolization treatment, and he was finding it more difficult to focus his vision in the mornings. (Def.'s Ex. C, ECF No. 55-7 at 2.) Plaintiff's headaches also seemed to worsen over time; in April 2013, Plaintiff reported experiencing weekly headaches that responded to over-the-counter medication (Def's Ex. C, ECF No. 55-3), but by April 2014, he required an occipital nerve block to address his headaches (Pl.'s Ex. L, ECF No. 51-12 at 39.) In March 2016, Plaintiff informed Ms. Fawber that his headaches had been occurring "almost daily over the past 2 months (which is more frequent than it had been in the past year). He believes that his stress level has been greater and that may be affecting the headache increase." (Pl.'s Ex. Q at 8.) Similarly, the record suggests that Plaintiff's problems with concentration worsened over time. Plaintiff alleged deficits in concentration as of April 30, 2013 when he filed his disability application, and in January 2014, Plaintiff's primary care physician documented chronic mild memory and concentration loss; however, in September 2014, Plaintiff reportedly complained to Dr. Romero that his concentration was getting worse. (Pl.'s Ex. L at 39.) In March 2016, Ms. Fawber observed that Plaintiff's cognitive problems had "greatly affected his daily life, so much that he

discussing the implications of his recanalized aneurysm and Plaintiff's options. (Id.) According to the Government, "[i]t defies logic that Plaintiff can now claim that an injury he specifically noted in his administrative claim as having occurred and likely to recur in the future was unknown to him then and is now 'newly discovered.'" (Gov't Br. Opp. at 8, ECF No. 55.) But even if Plaintiff knew the general statistics associated with recanalization of larger, basilar tip aneurysms, there is nothing in the record to suggest that Plaintiff could have predicted, with any degree of reliability, the number of future treatments he would likely require over the course of his lifetime. Dr. Romero did not specifically opine on this matter until he issued his supplemental report on April 25, 2016 (see Pl.'s Ex. U, ECF No. 51-21) -- well after the point where Plaintiff's condition had stabilized. There is nothing in the record that suggests Dr. Romero ever related this information to Plaintiff prior to May 1, 2013, nor is it clear that he was in a position to do so.

now has his cousin assist him." (Pl.'s Ex. Q at 8.) And, as previously discussed, Dr. Romero opined in April 2016 that Plaintiff would likely experience a worsening of his brain injury symptoms with every future recanalization treatment, including worsening headaches, confusion, memory loss, and cognitive limitations. (See Pl.'s Ex. U, ECF no. 51-21.) Collectively, these developments constitute intervening facts that support an amendment of Plaintiff's damages claim. *See Michels v. United States*, 31 F. 3d 686, 688 (8th Cir. 1994) (expressing agreement with "the many decisions acknowledging that a known injury can worsen in ways not reasonably discoverable by the claimant and his or her treating physician, and holding that such "newly discovered evidence" or "intervening facts," if convincingly proved, can warrant § 2675(b) relief")(citing authority).

Third, the medical evidence indicates that some of Plaintiff's injuries, and certain elements of his damages, were not reasonably discoverable as of the date that Plaintiff filed his FTCA claim. Prior to May 1, 2013, Plaintiff had not been diagnosed with a permanent thalamic brain injury, probable neurogenic bladder, basilar artery segmental stenosis, or cerebral atrophy – all of which were diagnosed by Dr. Bonfiglio in February 2015. While there may have been references concerning some of these problems in Plaintiff's medical records, "they only became reasonably foreseeable after the physicians' diagnoses." *See Bravo-Garcia,* 2015 WL 224625, at *7. In addition, Plaintiff could not have foreseen as of May 1, 2013 that there would be complications associated with his May 9, 2013 coil embolization procedure, including the loss of coil in his brain and his subsequent re-hospitalization to address a retroperitoneal hemorrhage. Nor could Plaintiff have known that he as at risk for early onset dementia, as Dr. Schwabenbauer and Dr. Romero did render opinions on this matter until 2015.

To a large degree, Plaintiff's amended damages figure is based upon the anticipated costs of his future life care plan – information that was not fully known nor fully knowable to Plaintiff when he filed his administrative claim. In outlining Plaintiff's needs, Dr. Bonfiglio considered Plaintiff's present limitations as informed by his entire longitudinal medical history. Ms. Fawber, in turn, relied on Dr. Bonfiglio's recommendations, among others, in calculating the costs of Plaintiff's future care. The Government suggests that Plaintiff should have sought these reports at an earlier point in time, prior to the denial of his administrative claim. Given the extensive and active nature of Plaintiff's treatment history, however, the Court cannot fault him for failing to procure these reports sooner. As discussed, it was not until late 2014 or early 2015 that his basilar tip aneurysm finally stabilized. Until that point, Plaintiff was engaged in ongoing, active treatment by a panoply of health care providers, and it made little sense for Plaintiff to seek a definitive life care plan. As far as this Court can tell, no provider had determined in 2013 whether, and to what extent, Plaintiff's injuries would impact his life expectancy. And even if Plaintiff had sought a comprehensive life care plan in a more timely fashion, the Court cannot assume that it would have mirrored the plan that Dr. Bonfiglio outlined in February 2015. In sum, then, given the severity and complexity of Plaintiff's medical problems and the considerable degree of care he received between January 2012 and October 2015, it was "understandable" in this case, as it was in *Bravo-Garcia,* that "the eventual seriousness of plaintiff's injuries did not become reasonably discoverable until after" the filing of his administrative claim. 2015 WL 224625, at *7.

For all of the reasons stated above, the Court concludes that Plaintiff has met his burden of demonstrating the existence of intervening facts and newly discovered evidence concerning his injuries that were not reasonably discoverable at the time he presented his administrative

claim. Moreover, if the newly developed evidence outlined above is accepted by the factfinder, it could reasonably support a finding that Plaintiff's injuries and resulting damages are substantially greater than reasonably could have been originally anticipated. Because Plaintiff has not provided any breakdown of his original damages claim, the Court is unable to deduce the precise amounts by which each constituent component of his damages has allegedly increased. Nevertheless, the Court cannot say that the alleged increase in Plaintiff's overall damages figure from $2 million to $3.95 million is either unsubstantiated or is legally and factually unreasonable such that it must be disallowed. Accordingly, Plaintiff's motion to amend his *ad damnum* clause will be granted.

It, of course, goes without saying that Plaintiff will still have to prove the value of his damages in any amount, original or as amended, at trial. As other federal courts have observed, even if recovery in excess of the original claim amount could be justified, the plaintiff nevertheless "'may only recover to the extent that the increased amount is attributable to the newly discovered evidence or intervening facts.'" *Resnansky v. United States,* Case No. 13-cv-5133-DMR, 2015 WL 1968606, at *10 (N.D. Cal. May 1, 2015) (quoting *Craig v. United States,* No. 00 C 958, 2002 WL 31115604, at *5 (N.D. Ill. Sept. 23, 2002) and citing *Michels,* 31 F.3d at 687 (permitting damages award in excess of claim amount only to the extent that the excess amount was "directly attributable to damages arising from newly discovered evidence or intervening facts")). While Plaintiff has demonstrated sufficient grounds for seeking damages beyond the amount set forth in his administrative claim, it remains his ultimate burden to "establish at trial that [his] injuries actually support an award in excess of the value[ ] stated in [his] FTCA claim[ ]." *Resnansky,* 2015 WL 1968606, at *10.

## III.  **CONCLUSION**

Based on the foregoing reasons, the Plaintiff's Motion to Increase the *Ad Damnum* Damages Amount (ECF No. 51) will be granted.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated:  March 30, 2017

cc:     All counsel of record